UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GARY NUDELMAN,                                          **<u>COMPLAINT</u>**

                                    Plaintiff,          JURY DEMANDED

        - against -


ADI RAVIV and HTI ASSOCIATES LLC,

                                    Defendants.
-------------------------------------------------------------------X

        Plaintiff Gary Nudelman ("Plaintiff"), by and through his attorneys, Westerman Ball

Ederer Miller Zucker & Sharfstein LLP, as and for his Complaint, respectfully alleges upon

information and belief as follows:

## <u>NATURE OF THE CASE</u>

        1.      Plaintiff is a retiree who owned and operated a dry cleaning business that his father

had opened.  Plaintiff sold his dry cleaning business in 2012 and began investing his modest

savings, mostly in low-risk equities, for his retirement.  Plaintiff has never been a sophisticated

investor or asset manager.

        2.      As a semi-retiree, in or around 2013, Plaintiff was introduced to defendant Adi

Raviv ("Raviv"), who was looking for gullible investors like Plaintiff to fund his cash merchant

and factoring business.  These businesses are notorious "hard money" lenders who disguise

criminally usurious loans as purported purchases or "factoring" of a business's receivables.  The

borrowers of these non-traditional (and usurious) disguised loans are typically required to "repay"

them through daily or weekly automatic ACH payments from the borrower's bank account.

Because Raviv and his alter ego, defendant HTI Associates LLC ("HTI"), lacked sufficient capital

to fund these disguised loans, he needed investors like Plaintiff to "participate" by providing the

funds for the disguised loans in exchange for a portion of the ACH payments received from borrowers.

3.      To induce Plaintiff to fund Defendants' disguised loans, Raviv falsely represented that Plaintiff would earn a fixed rate of return from the borrowers' daily or weekly ACH payments. Raviv further duped Plaintiff by acting like Plaintiff's friend, often socializing with Plaintiff, and using their shared Jewish heritage as a means to convince Plaintiff that Raviv was a trusted friend and advisor. The reality is that, for years, Raviv used this "friendship" to take advantage of Plaintiff and fleece him of millions of dollars of personal retirement savings.

4.      In fact, again and again, Raviv falsely represented that Plaintiff would earn a fixed return through his "participation" in Defendants' disguised loans, but on nearly every occasion, Raviv claimed that Plaintiff could not be repaid because the purported borrowers defaulted on their repayment obligations, causing significant losses for Plaintiff. It is not clear whether any of Defendants' purported borrowers and loans were real. What is clear is that Raviv was simply pocketing the money that Plaintiff gave to Defendants with no intention of ever repaying him.

5.      In or around 2018, Raviv introduced Plaintiff to one of Defendants' purported borrowers, Adam Omacha ("Omacha"). Omacha purportedly in the business of wholesale ladieswear, real estate, and exotic cars, though his various alter egos, including Tan Buddha Wholesale, LLC ("Tan Buddha"), Luxe Wholesale, LLC, Bouget Inc., and KTO Realty LLC (collectively, the "Omacha Entities").

6.      While the Omacha Entities were ostensibly "borrowers" of HTI's purported "loans," Raviv and Omacha presented themselves to Plaintiff more as business partners, rather than as being in an arms-length lender-borrower relationship.

2

7.      As set forth with greater particularity below, Raviv and Omacha – through their respective alter egos – schemed to take as much of Plaintiff's retirement savings as they could by falsely representing to Plaintiff that he was "participating" in HTI's purported loans to the Omacha Entities, that Plaintiff would earn a fixed rate of return from those purported loans, and that the Omacha Entities were operating thriving businesses that had the ability to repay these purported loans.

8.      In reality, however, Raviv and Omacha simply pocketed the money that Plaintiff gave to Defendants with no intention of ever repaying him.

9.      To further induce Plaintiff to continue "funding" HTI's purported loans to the Omacha Entities, Raviv repeatedly purported to "consolidate" the Omacha Entities' existing debts owed to Plaintiff while demanding that Plaintiff "fund" *additional amounts* for such "consolidations."   In reality, Defendants' purported "consolidations" of the amounts owed to Plaintiff were a sham to induce Plaintiff into giving Raviv and Omacha more and more money.

10.      In the end, when Plaintiff refused to continue "funding" additional purported loans to the Omacha Entities, Raviv and Omacha simply ceased any repayments of the amounts owed to Plaintiff, leaving Plaintiff with losses of millions of dollars from his retirement savings.

## PARTIES

11.      Plaintiff Gary Nudelman is a natural person who resides in Florida.

12.      Defendant Adi Raviv is a natural person who resides in New Jersey.

13.      Defendant HTI Associates LLC is a limited liability company formed under the laws of New York State with a principal place of business in New York County.

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in

controversy exceeds $75,000. Diversity of citizenship exists because Plaintiff is a citizen of Florida, Raviv is a citizen of New Jersey, and HTI is a citizen of New York.

15.     This Court has personal jurisdiction over Defendants because, among other reasons, Defendants entered into several Promissory Notes with Plaintiff pursuant to which they agreed that "[a]ny suit, action or proceeding arising hereunder or under [Raviv's] Personal Guaranty, or the interpretation, performance or breach hereof or thereof, shall, if [Plaintiff] so elects, be instituted in any court residing in New York at the sole discretion of [Plaintiff]."

16.     This Court has personal jurisdiction over Defendants for the additional reason that Defendants committed their tortious conduct alleged herein in the State of New York, and Plaintiff was harmed by Defendants' tortious conduct in the State of New York.

17.     This Court has personal jurisdiction over Defendants for the additional reason that Defendants conducted business in the State of New York.

18.     Pursuant to 28 U.S.C. § 1391, venue in this District is proper because, among other reasons, HTI's principal place of business is in this District, a substantial part of the events giving rise to the claims herein occurred in this District, and because Defendants agreed to submit to the personal jurisdiction of any court in the State of New York to adjudicate claims arising under the parties' contracts giving rise to this action.

## FACTUAL BACKGROUND

### Raviv Fraudulently Induced Plaintiff to "Participate" in HTI's Purported Loans

19.     In or around June 2018, Raviv introduced Plaintiff to Omacha, as the purported owner of "businesses in the wholesale ladieswear arena." Raviv falsely represented that Omacha "recently opened a store in Washington Heights" and purportedly also invested in "real estate foreclosures in Fort Lee, Englewood and the surrounding townships." Raviv suggested that "there is an interesting investment opportunity for us [*i.e.*, Defendants and Plaintiff] with him [Omacha]."

To induce Plaintiff in to believing that Omacha was a successful businessperson, Raviv falsely represented that "another dear friend" loaned $800,000 to Omacha to invest in property in Fort Lee, and that "the loan plus interest and fees were paid back, and [Omacha] walked away with a nice profit in several months."

20.    On July 25, 2018, Raviv solicited Plaintiff for "a $150-250K deal to fund [Omacha] in early August, to pay back starting 2 weeks later on a weekly basis and mature on December 31, 2018" and the "factor rate will be 1.125." Raviv falsely represented that Omacha would use this cash "to buy various closeouts at 'ridiculous' prices that [Omacha] can negotiate with cash but are difficult to obtain on credit."

21.    On July 30, 2018, Raviv followed up on his solicitation by asking Plaintiff to invest $150,000 in Raviv's factoring arrangement with Omacha. Raviv falsely represented that the deal "makes a lot of sense and [Omacha's] business can certainly afford it." Raviv again falsely represented that "[t]he use of proceeds is to buy various closeouts at 'ridiculous' prices that [Omacha] can negotiate with cash but are difficult to obtain on credit."

22.    On September 22, 2018, Raviv solicited Plaintiff for "an opportunity now to put together a $150-250K deal for [Omacha] to fund in early October, to pay back starting 4 weeks later on a weekly basis and mature on March 31, 2018" with a factor rate of 1.20. Raviv proposed that Plaintiff invest $100,000–$150,000, while Defendants purportedly would invest $20,000–$50,000. Raviv again falsely represented that the deal "makes a lot of sense and [Omacha's] business can certainly afford it." Raviv also falsely represented that "[t]he use of the proceeds is to open a second retail store on Fordham Road in the Bronx" and to "buy various closeouts at 'ridiculous' prices that [Omacha] can negotiate with cash but are difficult to obtain on credit."

23.    On February 21, 2019, Raviv solicited Plaintiff to fund a $250,000 loan to Omacha "with 15% interest (flat sum) payable weekly over 52 weeks @$5,528.85 per week."  Raviv falsely represented that Omacha would use the loan to obtain a $1.5 million line of credit from American Express.  In order to induce Plaintiff into believing that Omacha had the ability to repay this loan, Raviv falsely represented to Plaintiff that Omacha was "in the process of selling 2 properties and will be putting up his condo for sale."

24.    When Plaintiff offered to fund $25,000–$50,000 of the purported loan, Raviv asked, "Is it a question of liquidity or trust?"  In response, Plaintiff stated that Raviv had "made the case for the security of the loan and I trust that you will structure it so it will be a relatively risk free investment."   Relying on Raviv's false representations concerning this loan, Plaintiff agreed to fund $100,000 of the loan, which he wired to Defendants on February 26, 2019.

25.    Less than two months later, on April 12, 2019, Raviv again solicited Plaintiff for "a possible new deal for [Omacha]."  To induce Plaintiff into believing that Omacha had the ability to repay this loan, Raviv falsely represented that "[t]hings are going well [for Omacha] and we can continue to see growth and expansion over the next several years.  The more time I spend with him, the more I like him and respect his business acumen" and his "street smarts."  In response, Plaintiff voiced concern that Omacha's "business model from what I see is vulnerable and a downturn in real estate [in] NYC could put him behind the 8 ball," but "if you feel you control the deal and know to provide safety for me I am in."

26.    On April 25, 2019, Raviv again solicited Plaintiff for "a new deal for [Omacha]" – this time, a loan of "$150K to $250K."  To induce Plaintiff into participating in this "new deal," Raviv falsely represented that Omacha's "business continues to grow and he has his sights on possibly opening a new retail store on Fordham Road in the Bronx, where he had a store two years

ago which was very successful, along with introducing a separate Plus line for his clientele, along with being able to procure larger quantities of inventory at lower prices with cash orders of size, additional capital is necessary." Raviv also falsely represented that Defendants' proposed loan "would be personally guaranteed by [Omacha] with the backing of his real estate, and the other businesses." When Plaintiff voiced his concerns about "some legitimate questions" about the collectability of any purported "guarantee" by Omacha, Raviv insisted that they speak in person so that he could assuage Plaintiff's concerns. Indeed, Raviv often invited Plaintiff out for meals (including with Omacha), where he could "fast talk" Plaintiff into "investing" his retirement funds in Raviv's various "investment opportunities" – all or most of which were bogus.

27.     On May 1, 2019, Raviv falsely represented to Plaintiff that "I had a lengthy discussion with [Omacha] over dinner last night and I feel even better about the direction that we [*i.e.*, Raviv and Omacha] are going in."

28.     Relying on Raviv's numerous false representations concerning Omacha's purported "business acumen" and "street smarts," on or about May 15, 2019, Plaintiff funded $125,000 of a purported loan from Defendants to the Omacha Entities in the amount of $150,000 for which Raviv promised to repay Plaintiff in the amount of $143,750 in 52 weekly installments.

29.     On August 9, 2019, Raviv falsely represented that he and Omacha were "making good progress and are looking to open a new wholesale activity in Los Angeles. [Omacha] and I spoke again and we would like to offer you to join us as a 1/3 partner in that venture. We would each put in $50,000. There is a couple in Los Angeles that we have hired, the wife is already working for [Omacha] as a buyer, and we are locating the store front that we would like to rent in the next week or so. We believe that there is great potential in this investment and it should be fun for the three of us." Raviv made these false representations to Plaintiff to make it appears as

though Raviv and Omacha were **business partners**, rather than in a traditional lender-borrower relationship.  By doing so, Raviv knew that his misrepresentations about the Omacha Entities' business prospects and ability to repay Defendants' purported "loans" were more convincing to Plaintiff.  In reality, Raviv and Omacha were business partners in duping Plaintiff, not in the ladieswear business as Raviv falsely represented.

30.    On November 2, 2019, Raviv solicited Plaintiff for a "new funding opportunity" in which Omacha purportedly "would payoff the existing deal we have with him at their current value, and we [*i.e.*, Defendants and Plaintiff] would then fund the difference between what [Omacha] will payoff (today it would be approx. $150K) and we [*i.e.*, Defendants and Plaintiff] would **reinvest** these proceeds ***plus an additional approx. $350K*** in a 2-year, 25% deal that will pay weekly."  In other words, Raviv was proposing that Plaintiff "reinvest" the money that Omacha would purportedly "payoff" ***plus*** fund an additional $350,000 with Defendants.  As such, under the terms that Raviv proposal, Plaintiff would receive ***nothing*** from Omacha's purported "payoff" and instead would have to give Defendants ***additional capital***.  Raviv falsely represented that Omacha would use this additional funding "to release $750,000 from his credit line by paying it off and waiting for 30 days, and we [*i.e.*, Raviv and Omacha] will open a new operation in LA and, possibly, take over his brother's store in Westchester."  Raviv also falsely represented that this new loan "will be secured (as before) with a personal guarantee and all assets (real estate, inventory, etc.)" and that Raviv "will continue to be invested alongside so we have very common interests and are always on the same side of the table."

31.    Five days later, while Plaintiff was still considering Raviv's "new funding opportunity," on November 7, 2019, Raviv "narrow[ed] down the 'ask' so that it's a $275K loan for 45 days at 10% fee (paying back $302,500)," for which Plaintiff would fund $250,000 and

Defendants would fund $25,000.  Raviv falsely represented that Omacha would be able to "reborrow to pay us back" and "[i]f for whatever reason there is a delay in the activation of the credit line, he will take out a short-term funding at a higher rate just to pay us back."  Raviv insisted that "[o]ne way or another, we [*i.e.*, Defendants and Plaintiff] will be paid back in 45 days."

32.    Relying on Raviv's misrepresentations about the terms of this loan and Omacha's ability to repay it, Plaintiff agreed to wire $250,000 to Defendants to fund this purported loan. Defendants, however, did not actually "fund" their portion of this loan.  In reality, this "loan" to the Omacha Entities (like all the other loans to the Omacha Entities) was a sham, and Raviv and Omacha simply pocketed the money that Plaintiff gave to them.

33.    On December 17, 2019, Raviv falsely represented to Plaintiff that Omacha "will be in a position to wire you back the 250,000 plus the 25,000 fee in the next few days."  However, instead of repaying Plaintiff, Raviv proposed that Plaintiff roll his purported repayment into "a new two-year deal for [Omacha] at a 1.25 factor rate."  Under this "new" deal, Defendants purportedly would loan Omacha $500,000, of which Raviv requested that ***Plaintiff*** fund $400,000– $450,000.  Raviv falsely represented that this "new" loan would purportedly be repaid in "104 weekly payments and a gross payback of 625,000."  Raviv represented that "[t]o fund this 450,000 [from Plaintiff] would require less than ***100,000 in <u>new capital</u> [from Plaintiff]*** (including repayment [o]f 275,000 for the short-term loan and 82,000 for the existing deals)."  In other words, Omacha's purported "repayment" of the amounts owed to Plaintiff would be used to "fund" Plaintiff's "new" loan of $450,000 and that "new" loan would require ***Plaintiff*** to fund an additional $100,000 "in new capital."

34.    On December 23, 2019, Raviv advised Plaintiff that the amount of this "new" loan to the Omacha Entities would be ***increased*** from $450,000 to $500,000.  Raviv again proposed

that Plaintiff fund $400,000 with Omacha's purported "repayment" of the amounts owed to Plaintiff, *plus* an additional $45,385.58 of *new* capital.  To induce Plaintiff into funding this "new" loan, Raviv falsely represented that Plaintiff's "return" would be 22.61% per year.  Relying on Raviv's false representations concerning the terms of this "new" loan and Omacha's purported ability to repay it, Plaintiff wired $45,385.58 to Defendants.  In reality, HTI did not "fund" any portion of this "new" loan, and Raviv and Omacha again simply pocketed Plaintiff's money.

35.     On April 3, 2020, Raviv falsely represented to Plaintiff that Omacha "is trying very hard to keep payments going but at this time he has no revenues."  Raviv nevertheless assured Plaintiff that Omacha had the ability to repay the loans by falsely representing that Omacha "has at least $750K-1.25M in equity in the house (and it is gorgeous!).  He will also put up for sale his Tom Hunter Rd. condo which should generate $250K-350K in net proceeds.  Further, he also [has] a property in Englewood in which he has $75K-150K in equity which is now on the market."  While giving Plaintiff these false assurances concerning Omacha's financial wherewithal, Raviv solicited Plaintiff for yet another "60 day bridge loan of $80K" to Omacha, of which Plaintiff would fund $60,000, purportedly "at a 10% return, with one 30 day option at 2.5%."

36.     Before Plaintiff could respond to Raviv's request that Plaintiff fund an additional $60,000 for a "bridge loan" to Omacha, on April 7, 2020, Raviv advised Plaintiff that Raviv and Omacha, collectively, "decided it was best for [Omacha] to suspend payments on all of his obligations [to Plaintiff] until the first week of May."

37.     On December 29, 2020, after months of not repaying Plaintiff, Raviv began soliciting Plaintiff to "fund" more "loans" to Omacha.  This time, HTI's purported "loans" to Omacha would be structured as: (i) an Amended and Restated $500,000 Secured Consolidated Loan; (ii) a $1 million line of credit note; (iii) personal guarantees from Omacha and his wife; (iv)

two Security Agreements with the Omacha Entities; and (v) an assignment of Omacha's life insurance policies.

38.     Relying on Raviv's false representations that these loans would be adequately secured and that Omacha had the ability to repay these loans, Plaintiff funded $500,000 for Defendants' purported loans to Omacha.  In reality, these new "loans" (like all of Defendants' prior "loans" to the Omacha Entities) were a sham, and Raviv and Omacha again simply pocketed Plaintiff's money.

39.     Less than three months later, the Omacha Entities had already defaulted on these new loans.  On March 2, 2021, Raviv proposed that the Omacha Entities' purported "loans" *again* be consolidated as a "7.5 % loan 'till the end of 2023 (under 3 years) on a weekly basis with a payment of approx. $3,750" and that ***Plaintiff fund an additional $400,000*** to "purchase" 80% of the consolidated loan.

40.     On June 30, 2021, Raviv suggested to Plaintiff that "it would be a good idea to fund [Omacha] $200K" for a 6% "fee" that Omacha would purportedly repay "at a rate of $3,000/day so that it will pay off by mid-November."  Raviv proposed splitting this purported loan with Plaintiff 50/50 "and repay [Plaintiff] weekly at the rate of $7,500/week."  Raviv falsely represented that this additional loan to Omacha "would help me/us so that he can generate additional revenues to support the start-up of the new store in NJ (@lushclothingnyc)."

41.     Relying on Raviv's false representations concerning this loan and Raviv's purported partnership in Omacha's ladieswear business, Plaintiff funded $100,000 of Defendants' purported "loan" of $200,000 to the Omacha Entities.  In reality, however, HTI did not "fund" any portion of this purported "loan," and Raviv and Omacha again simply pocketed Plaintiff's money.

42.     On August 27, 2021, Raviv falsely represented to Plaintiff that Omacha was temporarily unable to repay his debts to Plaintiff because Omacha was purportedly in Syria where he "was unable to find a way to transfer his funds out of the country without having to incur a significant (50%?) penalty but was going to explore different avenues."

43.     On October 1, 2021, Raviv advised Plaintiff that Omacha "asks if you can do $200K so that with my $100K he has enough to justify going out to LA to order the goods he needs for the upcoming holidays."  While Plaintiff was hesitant to loan Omacha any additional money, Plaintiff responded to Raviv by asking, "*if I must* can we split [this new loan to Omacha] 150-150?"

44.     On October 5, 2021, Raviv falsely represented that if Plaintiff loaned Omacha $150,000, Defendants would purportedly match Plaintiff's $150,000 by loaning Omacha "$50K in credit cards . . . and then $50K in 2 weeks and $50K in another 2 weeks so that he will be able to pay and get the inventory he needs."   In reliance on Raviv's false representations that Omacha would use these funds "to justify going out to LA to order the goods he needs for the upcoming holidays" and that Defendants were matching Plaintiff's investment of $150,000 in this purported loan, Plaintiff wired $150,000 to Defendants.  Again, however, Defendants never funded the other half of this purported "loan," and Raviv and Omacha simply pocketed Plaintiff's money.

45.     On December 19, 2021, Raviv told Plaintiff that he "want[ed] to see if we can't help [Omacha] out tomorrow with his $100K payment to AX" and falsely represented that he "believe[s] that [Omacha] is going to restructure his business in a very positive way by year end" and "will be able to free up over thirty thousand a week in cash flow by April / May."  Raviv further falsely represented that "[i]f you can wire 100K tomorrow, I will give him a credit card for 50K, and I will wire back to you by the end of the week for that 50K."  Relying on these false

representations, the next day, Plaintiff wired $50,000 to Defendants. Again, in reality, Defendants never funded their half of this purported loan to the Omacha Entities, and Raviv and Omacha simply pocketed Plaintiff's money.

46.    On February 7, 2022, Raviv proposed to Plaintiff a purportedly "good lending opportunity here to both help [Omacha] purchase inventory for the coming Valentine's Day/Spring Season and reducing his rent by 50% in his Luxe wholesale store (saving $5-6K/month, I believe and negotiated) and negotiating the same with his Bouget (retail) landlord." Raviv requested that Plaintiff consider participating in "a $300,000 loan" and falsely represented that Defendants would contribute $100,000 "at 15% paid out weekly over one year." Raviv further falsely represented that Omacha would provide his personal guarantees as well as cross collateral guarantees "as we always do." Relying on these false representations, on or about February 10, 2022, Plaintiff contributed $100,000 for this purported loan to Omacha. Again, in reality, Defendants never funded their portion of this purported "loan," and Raviv and Omacha simply pocketed Plaintiff's money.

47.    On February 17, 2022, Raviv falsely represented that he "funded [Omacha] another $50K so that he can restructure his Luxe lease" that allegedly lowered Omacha's rent by 50%. Raviv further falsely represented that Omacha "has the agreement of the Bouget landlord to do a similar deal." Raviv also falsely represented that he gave Omacha additional money "to make inventory purchases while he is in LA" and that Omacha "believes that he has secured great merchandise that will sell extremely well." Raviv further falsely represented that Omacha "has committed to putting his home on the market in the next few weeks with a view to selling it this spring for $2.2-2.55MM (which would repay his mortgage ($1.2MM), the ConnectOne credit line ($750K) and provide him at least several hundred K to reduce his obligations)." Raviv then

requested that Plaintiff provide an additional $50,000 towards a purported loan to Omacha. Raviv falsely represented that Omacha "has committed not to come back for additional funds for at least…well, let's say that if it's any time before summer, it will be too soon."

48. On March 25, 2022, Raviv falsely represented that Omacha "will be traveling down to Miami this weekend and then to LA next weekend to purchase additional inventory for Genuine, Luxe and Bouget (which officially reopens today) and for the new Miami store." Relying on Raviv's false representations, Plaintiff contributed an additional $50,000 towards a new purported loan to Omacha for $150,000. In reality, however, Defendants never funded their portion of this purported "loan" to Omacha, and Raviv and Omacha simply pocketed Plaintiff's money.

49. On April 11, 2022, Raviv solicited Plaintiff for an additional purported loan to Omacha in the amount of $200,000, falsely representing that Defendants "already funded $125K [of this proposed $200K loan] in the past week" and that if Plaintiff "could participate in it at least $100K, [Raviv] would pay [himself] back $25K" so that he and Plaintiff each "would then have funded [the $200k loan] with $100K." Raviv falsely represented that Omacha would use this purported loan "to propel the Miami store into a significant cash flow position with great inventory." Raviv further falsely represented that he is "confident that this will be a positive development" for Omacha's business. In reality, Raviv again was simply conning Plaintiff into handing over more and more of his retirement savings.

50. On April 28, 2022, Raviv again solicited Plaintiff for an additional purported loan to Omacha, this time for $150,000. When Plaintiff declined, Raviv falsely represented that Omacha "is quite anxious to get this 'last' deal done before Mother's Day." To assuage Plaintiff's concerns about the Omacha Entities' inability and refusal to repay their prior debts to Plaintiff, Raviv falsely represented that "I would appreciate it if we [*i.e.*, Defendants and Plaintiff] could do

this deal for [Omacha] but I will offer it up for *me to borrow the money from you* not [Omacha]. I will then relend it to him but ***I will be on the hook for it***. I want him to have the Miami store up and running though he has laid out more money than planned (thankfully it's for inventory and nothing more), almost all of it coming from me." When Plaintiff hesitated, Raviv proposed that if Raviv could "possibly scrape together another $150K of credit card availability to give [Omacha], can you fund $75K in the next 2 weeks?"

51.    On May 10, 2022, Raviv again asked Plaintiff "is there anything [Plaintiff] can do to help out on funding inventory for Miami?" Raviv falsely represented that he had given Omacha "an extra $100K recently, and could give him additional funds (maybe $50K)- that is, if you could participate for $150K and I would add my $50K, this would be a $300K deal that would pay down with a 15% fee by the end of October." Raviv further falsely represented that "the Miami store could achieve very nice traction from the limited visibility we have had to date (initial sales and customer visits to the store that is somewhat sparsely outfitted)." In reality, Raviv did not give Omacha any money, and Raviv made those misrepresentations to induce Plaintiff into giving Defendants more money to "fund" purported "loans" to Omacha.

52.    In response to this proposal, Plaintiff told Raviv that "I am really begging you guys [*i.e.*, Raviv and Omacha] not to put this pressure on me, because I sincerely want to help and take these needs and 'pleas' by [Omacha] to heart." Plaintiff further told Raviv that "I do feel a strong obligation to you to do whatever I can to help bail you out if you are in a crunch."

53.    On May 12, 2022, Raviv continued to pressure Plaintiff for "the wire for the $75K." Plaintiff finally gave in to Raviv's pressure and gave Defendants $75,000 to fund a new purported loan to Omacha in the amount of $300,000, relying on Raviv's false representation that Defendants

had funded $125,000 of this loan.  In reality, Defendants did not fund any portion of this purported loan, and Raviv and Omacha simply pocketed Plaintiff's money.

54.    On May 24, 2022 Raviv and Omacha had dinner with Plaintiff during which they falsely represented to Plaintiff that Omacha needed additional funds to consolidate two of Omacha's stores and close Bouget.  Rely on their false representations, on May 26, 2022, Plaintiff wired $50,000 to Defendants as a "participation" in a $300,000 loan to Omacha.  In reality, Defendants yet again did not fund any portion of this purported loan, and Raviv and Omacha simply pocketed Plaintiff's money.

55.    On June 17, 2022, Raviv solicited Plaintiff for an additional $200,000 for a purported "$300K funding."  Raviv falsely represented that Defendants would contribute "$100K over the next 1-2 weeks as part of this deal as I've given him significant amounts over the past 2 months."  Raviv further falsely represented that this purported loan would "allow [Omacha] to purchase over $300K of inventory.  This is what is needed now for the last push going into the summer."  To induce Plaintiff into believing that this loan would be repaid, Raviv made the following misrepresentations about the Omacha Entities' business:

- "Sales have been good overall but inventory levels are coming down, especially in Miami (while sales are ranging in the $2-3K/day w-2 employees and a $4K rent; sales could go much higher with the right merchandise)";

- "Genuine is selling well but needs new merchandise and the Plus sizes and shoes that are being sold through Luxe are moving nicely";

- "While we considered closing Luxe, the landlord has agreed to reduce the monthly rent by $5K and add only $2K/month of back rent to the payments (to clear the past amounts due). To agree to this, the Luxe landlord is asking for a $20K one-time payment to be credited against the past due rent to finalize the deal. It appears to be the right move rather than giving up the space";

- "Bouget is being shut down at the end of this month and has been selling closeout items at a brisk pace";

16

- "[Omacha] has found a 3,000 sq.ft. store in Hackensack, NJ for $4K/month and he will move the Colombian husband/wife team there (closer to their home) to man the store and take over operations. He believes that he will be able to maintain the sales level of Bouget in that location and increase the profitability of the store while also removing the maintenance of the business (daily need to move merchandise to/from the store, monitor the cash register and close the register at the end of the day). This will save [Omacha] at least $10K/month";

- "The exotic car rental business is generating positive cash flow as all cars have been out on the road the majority of the past month and a half and are booked going into the summer. With the analysis of the portfolio that we are finalizing, there is a net equity value of over $400K even at Kelley Blue Book values which are believed to be at least 10-30% below realizable value given certain scarcity elements in this market. [Omacha] has submitted a request to ConnectOne to provide a much greater line of credit and/or working capital against the value of the cars and should hear back by 6/29/22 at which time he is meeting with the bank in person. We agreed that if [Omacha] receives an attractive financing offer, we will consider keeping the cars and operating the business. Otherwise, we will attempt to sell the portfolio as a whole to maximize the value (as an existing business in this space would probably pay a premium to have access to all of these cars in one simple transaction)";

- "[Omacha] has signed the agreement to list his home for sale today. It is being offered at $3 million and already has a showing tomorrow and several inquiries even before the listing has been published. Please recall that ConnectOne has approx. a $1.2 million mortgage, $750K line of credit on Genuine/Luxe, and a $100K line of credit on Firewheels NYC. Even if the house sold for 'only' $2.5 million (net), it would generate over $400K in proceeds after paying off all of the ConnectOne obligations. This would allow [Omacha] to purchase new inventory for the fall/winter, pay off Yellowstone to remove the judgment they have on the various companies and on him individually (can be eliminated for $180K or less) which would open up new ways of financing the businesses, continue/accelerate service of his existing obligations to us, and go back into the real estate arena";

- "[Omacha] will pay down almost $250K of what he owes you (out of $850K today) by the end of the year, with less than $600K remaining. Approx. $225K of this balance will be paid off by December 2023 and that would leave a $140K balance to you at that point"; and

- "To accomplish all of this requires continued support and cooperation, and an intense level of involvement by yours truly. I spend a considerable amount of time each and every week with [Omacha] getting updated on the business and strategizing about the future."

56.     In making these misrepresentations, Raviv again intentionally gave Plaintiff the false impression that Raviv and Omacha were ***business partners*** in Omacha's ladieswear, real estate, and exotic car businesses, when in reality, Raviv and Omacha were scamming Plaintiff into handing over his retirement savings to them with no intention of ever repaying him.

57.     On July 11, 2022, Raviv continued to pressure Plaintiff for additional money to purportedly loan to Omacha, falsely representing that Omacha "applied for the home equity, put the house up for sale and [is] selling the cars."  Raviv further falsely represented that Omacha "really needs $100K until the funds arrive from the car sale and I can guarantee you that the cars will be sold."  The next day, Raviv continued his pressure tactics, falsely representing that Omacha "has closed Bouget, secured the Hackensack store (no significant dollars needed for several weeks), has the Lamborghinis sold to the dealer but is getting higher offers from individuals on Ebay Motors, and is working with ConnectOne on his home equity line and further financing for the remaining car portfolio (which he will also sell)."  Raviv further falsely represented that Omacha "really needs your help now for several weeks by which time the proceeds of the car sales and/or the home equity will come in.  ***I can assure you that you will receive your $100K back with a handsome return*** for the period which would be anywhere from 3-6 weeks…***Gary, we really need your help***.  This will keep the flow of goods and will allow him to keep his Amex credit.  ***I will meanwhile continue to help him to fund the ongoing business*** and, if possible, we [*i.e.*, Defendants and Omacha] will repay you even more quickly.  ***You will have my guarantee*** that from the Lamborghini proceeds which will be at a minimum $180-190K, ***you will be repaid in full***.  ***Please help us out***."

58.     Relying on these false representations, on or about July 19, 2022, Plaintiff wired an additional $50,000 to Defendants.  However, Raviv's claim that Plaintiff "will be repaid in full"

was knowingly false, and Defendants and Omacha intentionally failed to repay Plaintiff any amount.

59.    On August 23, 2022, Raviv falsely represented to Plaintiff that he had "come up with an idea that may address your concerns and pay you back within 5 ½ years." Raviv proposed that Defendants "purchase" Plaintiff's share of the purported "loans" to Omacha, "add that balance of $872K to the current balance of $444K and the amount still due [to Plaintiff] on the purchase of the Capacity Portfolio of $33.3K." Raviv then falsely represented that "[i]n order to make it work for me, *I only need $150K in additional capital*." In other words, Raviv was proposing to "purchase" the debt owed to Plaintiff *if* Plaintiff gave Defendants *an additional* $150,000.

60.    Two days later, on August 25, 2022, Raviv proposed a similar consolidation of the amounts owed to Plaintiff into a single $1.5 million loan in exchange for Plaintiff giving Defendants "$50K in new cash." On August 29, 2022, Raviv continued to pressure Plaintiff to "wire the $50K." Succumbing to Raviv's pressure, and relying on Raviv's false representations as to the terms of the purported "consolidation" of the debt owed to Plaintiff, Plaintiff wired $50,000 to Defendants on August 30, 2022.

61.    Over a month later, on November 2, 2020, Raviv still had not provided Plaintiff with a draft of the purported "consolidation" of the amounts owed to Plaintiff. For that purported consolidation, Raviv falsely represented that "there was an unallocated balance of $19,026.12," for which Raviv proposed that he repay Plaintiff only $15K, which would purportedly "leave a balance of $4,026.12 to cover future legal expenses and fees (which I have yet to fully incur) when putting together the loan documents" for the purported consolidation. Raviv also falsely represented that "I have a large Amex payment due next Tuesday (November 8th) for monies given to [Omacha]," and requested that Plaintiff "lend me $35K via wire and I will repay you $50K (this

$35K plus the $15K) in addition to a $5K fee over the next eight weeks." Relying on Raviv's false representations, Plaintiff wired ***an additional*** $35,000 to Defendants that day. In reality, Defendants' calculations of purported "unallocated" balances and purported payments to American Express for "monies given to [Omacha]" were bogus, and Defendants simply pocketed Plaintiff's money.

62. On November 6, 2022, Raviv solicited Plaintiff for yet another "participation" in a purported loan to Omacha of $100,000. Raviv requested that Plaintiff fund $50,000 and falsely represented that he and Plaintiff would "split this $100K deal 50/50 (still to pay back in 90 days with a 10% fee)." To induce Plaintiff to fund this purported loan, Raviv falsely represented that Omacha "can turn around and fund the orders that he had set aside in LA with the accessories vendor" and that Omacha's new store is "really coming along nicely. He'll have a soft opening tomorrow and then plans for a larger event after he receives the goods and it's 'packed' with merchandise." Relying on Raviv's false representations, Plaintiff gave Defendants an additional $50,000. In reality, Defendants never funded any portion of this purported loan, and Raviv and Omacha simply pocketed Plaintiff's money.

63. On February 22, 2023, Raviv continued to pressure Plaintiff to "help in any way with some additional short-term fundings" to the Omacha Entities. To induce Plaintiff to make such additional short-term fundings, Raviv falsely represented that Omacha "has made some changes in the business that are beneficial but we [*i.e.*, Raviv and Omacha] still have a ways to go. The most pressing issue is to be able to 'survive' until the closing on very few sales and limited funding options/alternatives. There is still merchandise (presold) sitting in Turkey that needs to be brought over to the US after a $16K payment and [Omacha] has to travel to Syria and possibly

Turkey and Dubai very soon to get his monies out of Syria and the merchandise out of Turkey. Maybe we can make some headway with the person in Dubai as well."

64.    On February 25, 2023, Raviv pressured Plaintiff to give him an additional $20,000 by again falsely representing that Omacha "is going to Syria to retrieve monies.  In addition, there has been much positive accomplishments over the past year as [Omacha] closed the exotic car rental business (still has possibility for some $ to come in due to several insurance claims he made on cars that were involved in accidents), restructured his clothing and accessories business so that it is more focused and poised to generate greater profits after closing Bouget and Luxe, selling Lush (Hackensack) to the Colombian couple that are running it, and possibly consolidating the 2 remaining stores on 36th Street into one.  In addition, the Green Capital judgment has been removed and the application process with the SBA forced [Omacha] to clean house and become much more organized."

65.    On March 7, 2023, Raviv finally circulated the draft documents for Defendants' purported "consolidation" and "purchase" of the amounts that Omacha owed to Plaintiff (more than six months after proposing such consolidation).  Plaintiff advised Raviv that he was "so confused" by the draft documents.

66.    On June 12, 2023, Raviv falsely represented to Plaintiff that Omacha "has received the money to travel and plans to depart in the next day or two to Syria, Dubai and possibly Turkey (to purchase some merchandise against which he has additional deposits that were made last year)."  Raviv further falsely represented that Omacha is "very cooperative and I believe that we will be able to work out a proper payment plan upon his return."

67.    On July 15, 2023, Plaintiff pleaded with Raviv and Omacha for the repayment of the money that he loaned to them, stating:

It has been almost a year since you defaulted on the "consolidation loan" after only a few payments, the wrap around renegotiated loan that would be paid 100%. The amount of that loan outstanding not including interest or time value is roughly $1,450,000. In November of 2022 I made 3 loans totaling $100,000 of which I believe 2 small payments were made. In January 2023 I made 1 loan which was paid back but before it was I made another loan of $15,000 which I believe 1 payment was made. . . . Over the years I have loaned you guys money and ***nothing was paid back unless I gave you more money to pay it back*** and the balance just kept increasing mostly through ***fresh money I sent always with a great story and a promise that this time it will be paid***. I loaned money for [Omacha's] cars, [Omacha] sold the cars but did not pay back the money, only asked for more. Stores in Florida and New Jersey which he needed money for inventory, I gladly loaned money to help, never paid and to add insul[t] to injury he sold the stores and ***did not return to me any money***. Accessories, uptown store, midtown store, across the street store, ***any help that you guys needed I was there and only asked for a fair return or sometimes none at all just repayment***. All with promises and stories that this is not risk money it will be paid back as planned. ***Never Happened***. Every time the story was forget about the past this time it will be different and I believed you guys. We went to dinner many times and ***each time I left giving you more money to help you in what you needed***. I mortgaged my house to give you money, I borrowed from my stock account, I found myself in a poor financial position mainly because I had given you my hard earned money and ***you did not pay me back, only asked for more***. I have sleepless nights and terrible anxiety which has affected my health over this situation. ***I am pleading with you guys to please pay me back my money***. . . . I have asked for a plan of repayment many times but you haven't even given me that courtesy of that. I cannot ask in more nicer terms to please straighten this out. I have very little recourse but I am hoping that through friendship and our relationships you will straighten this out. I was a friend when you guys needed me and ***please it is time to just pay back the money you took from me***.

68.    Neither Raviv nor Omacha bothered to respond to this email.

69.    On September 20, 2023, Raviv proposed to Plaintiff yet another purported "good opportunity." In response, Plaintiff stated:

I guess I have to explain myself for the u[m]pteenth time. You don't get it. Regardless of your position, ***you and [Omacha] have put me in a terrible position both financially and mentally***. I am in this ***at your insistence*** on these loans and ***my trust of you***. If not for that I would not have invested to the extent I did. . . . I

22

entered into a renegotiated agreement with you and [Omacha], lengthening time and cutting interest rate to 7%. I thought that was very gracious of me. The loan was to provide living money for me in the event I did not have it someplace else. I do not have it someplace else, it is all going to interest and investments that do not grow. This agreement made by me, you and [Omacha] was a set in stone absolute, nothing could go wrong agreement. I need those payments now very badly. I received a handful or so of payments and then they stopped. How could you have done this too me? In November I gave another 100k, one payment was made. February 15K one payment was made. Promises when [Omacha] gets back from Syria, nothing, when the cars are sold, nothing, when Florida was sold, nothing New Jersey, nothing, inventory, nothing and so on. I [lent] [Omacha] money on all of these projects but *he did not see fit to return the money I [lent], only give me more*. He received money back on all of them but *never paid me back*, only lets [renegotiate] and *then stop paying*. You are relying on [Omacha] to somehow change his stripes, you want to give him more money but between us there must be around 3,5mm he has taken and it somehow disappeared in 4 years. . . . I CANNOT afford to lose one more penny with you guys. You and [Omacha] have to start paying me back. I cannot emphasize how critical this is and I cannot hear the same stories of how this time will be different. Go back to our correspondence and how many time[s] you have you said that. . . . There is something very wrong here. . . . I am here because of you up to my neck. [Omacha] cannot continue to take my money and not pay me back. *We are talking over 1.5mm my end* there has to be a resolution one way or another. . . . I would very much like to believe that this will work out but how can I? *I implore*, sit down with [Omacha] and figure a way on how to start paying me back . . . . I cannot take this double teaming on me mentally and financially I am in a very bad position. *I could not ask you in nicer terms, please*.

70. Not surprisingly, Raviv responded by *asking Plaintiff for even more money*, falsely representing that he and Omacha "know that the LA store is our last big hope (other than the Syrian real estate) for generating cash flow and repayments for both of us. *Without your help*, it will be harder." In reality, there was no "LA store" or "Syrian real estate" from which Defendants and Omacha would repay Plaintiff.

71. After this email, Plaintiff finally stopped giving Defendants his retirement money because he finally realized that Raviv and Omacha were not really his friends and that they had no intention of ever repaying him.

**HTI is Raviv's Alter Ego**

72.    Raviv exercises complete domination and control over HTI.

73.    HTI is wholly owned, controlled, and managed by Raviv.

74.    Other than Raviv, HTI has no employees, officers or members.

75.    HTI's purported address, 320 East 72nd Street, New York, NY 07024, was Raviv's home address.

76.    HTI is simply a shell company through which Raviv committed his fraud against Plaintiff detailed herein.  For instance, by making false representations to Plaintiff, Raviv induced Plaintiff to enter into purported "participation" agreements with HTI pursuant to which Plaintiff gave Defendants money to "purchase" a portion of HTI's purported loans to the Omacha Entities. In reality, however, Raviv and Omacha simply pocketed the money that Plaintiff gave to Defendants as purported "participations" in HTI's purported loans.

77.    HTI does not exercise corporate formalities.

78.    HTI does not hold annual or special meetings of its members.

79.    As detailed above, Raviv and HTI operate as a single economic entity by commingling their funds and not distinguishing between their debts and obligations.

80.    As detailed above, Raviv intentionally keeps HTI undercapitalized so that HTI cannot pay its debts or satisfy its obligations.  For instance, Defendants repeatedly induced Plaintiff to fund the lion's share of HTI's purported loans to the Omacha Entities because HTI had insufficient capital to fund those purported loans itself.

81.    In light for the foregoing, HTI is Raviv's alter ego and its corporate veil should be pierced so that Raviv is individually liable for HTI's liability to Plaintiff.

**The Omacha Bankruptcy**

82.      On June 20, 2024, Omacha filed a Chapter 11 Voluntary Petition in the United States Bankruptcy Court for the District of New Jersey, No. 24-16238 (the "Omacha Bankruptcy").

83.      In the Omacha Bankruptcy, Omacha disclosed that Plaintiff has a "Business Loan" claim against him in the amount of $1 million.

84.      On August 20, 2024, Plaintiff filed a proof of claim in the Omacha Bankruptcy for $1,615,420.45.

85.      On September 9, 2024, Plaintiff filed an adversary proceeding Complaint, Adv. Pro. No. 24-01576, in the Omacha Bankruptcy objecting to the discharge of Omacha's debt to Plaintiff on the grounds that such debt was obtained by means of false pretenses, false representations, fraud, and other illegal and wrongful actions (the "Adversary Proceeding").

86.      On January 17, 2025, Omacha filed a Small Business Debtors' Second Modified Plan of Reorganization (the "Plan").

87.      On February 21, 2025, and February 24, 2025, Omacha filed two stipulations with Plaintiff modifying the Plan and providing for Plaintiff's acceptance of the Plan as a settlement of the Adversary Proceeding (the "Stipulations").

88.      On May 30, 2025, Omacha and the Omacha Entities executed a Consent Judgment granting Plaintiff a money judgment in the amount of $800,000.  Pursuant to the Plan and Stipulations, Plaintiff is required to hold the Consent Judgment in escrow and refrain from filing and enforcing it unless and until Omacha defaults on his obligation to pay Plaintiff in accordance with the payment plan set forth in the Plan and Stipulations.

89.      However, almost immediately after the Bankruptcy Court confirmed the Plan, Omacha violated its terms.  As a result, on August 11, 2025, one of the secured creditors in the Omacha Bankruptcy filed a motion to convert the Omacha Bankruptcy into a chapter 7 liquidation.

90.    On September 11, 2025, the Omacha Bankruptcy was converted from a chapter 11 case to a liquidation under chapter 7 of the Bankruptcy Code. As a result, Omacha cannot comply with his obligations under the Plan.

91.    On September 16, 2025, Plaintiff sent a Notice of Default to Omacha providing notice of the default and intent to seek entry of the Consent Judgment.

92.    On November 13, 2025, Plaintiff filed a motion to reopen the Adversary Proceeding for the purpose of entering the Consent Judgment on the grounds that Omacha failed to comply with the Plan and was in default on his obligations to Plaintiff.

93.    On December 23, 2025, the Bankruptcy Court reopened the Adversary Proceeding and entered the Consent Judgment against Omacha and the Omacha Entities.

94.    To date, Omacha and the Omacha Entities have not satisfied the Consent Judgment in any way.

## COUNT ONE
### (Fraud)

95.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if full set forth herein.

96.    As set forth above, Defendants intentionally made numerous misrepresentations and/or omissions of material fact to Plaintiff, including, without limitation, how HTI's purported loans to the Omacha Entities would be used, the Omacha Entities' purported ability to repay those loans, and what Defendants and the Omacha Entities actually did with the money that Plaintiff gave to Defendants.

97.    Defendants knew that their misrepresentations to Plaintiff were false and that their omissions of material fact were misleading.

26

98.     Defendants intended for Plaintiff to rely on their misrepresentations and/or omissions to induce Plaintiff to give them money by duping him into believing that he was "participating" in HTI's purported loans to the Omacha Entities.

99.     Plaintiff justifiably relied on Defendants' misrepresentations and/or omissions of material fact when he gave Defendants money, believing that he was "participating" in HTI's purported loans to the Omacha Entities.

100.     As a direct and proximate result of Defendants' misrepresentations and/or omissions of material fact, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $1.5 million.

101.     Additionally, Plaintiff is entitled to punitive damages against Defendants because Defendants' conduct was egregious, directed at Plaintiff, and part of a pattern directed at the public generally.

## COUNT TWO
### (Unjust Enrichment)

102.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if full set forth herein.

103.     As set forth above, Defendants were enriched at Plaintiff's expense when Defendants induced Plaintiff, on multiple occasions, to give Defendants money under the false pretenses that Plaintiff was "participating" in HTI's purported loans to the Omacha Entities.

104.     It would be against equity and good conscience to permit Defendants to retain the money that Plaintiff gave to Defendants.

105.     As a direct and proximate result of the foregoing, Defendants are liable to Plaintiff for damages in an amount to be determined at trial, but in no event less than $1.5 million.

## COUNT THREE

### (Breach of Promissory Note Dated December 30, 2020)

106.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if full set forth herein.

107.    Pursuant to a Promissory Note dated December 30, 2020, HTI promised to pay Plaintiff $250,000 "with cumulative interest of $2,500 and a professional service fee of $2,500 on or before March 31, 2021."

108.    The Promissory Note also provides that "In the event of default, [HTI] will also be responsible for any costs of collection on this Note, including court costs and attorneys' fees."

109.    The Promissory Note also provides that "any payment that is not honored when presented due to insufficient funds, there shall be a fee of $1,500 for the first rejection, and an extra $750 (on top of the original $1,500 fee) for each and every rejection thereafter."

110.    At the bottom of this Promissory Note, Raviv personally guaranteed the Promissory Note.

111.    The Promissory Note, including Raviv's personal guarantee therein, is a valid and binding contract.

112.    Plaintiff satisfied all of his obligations under the Promissory Note.

113.    HTI and Raviv breached the Promissory Note by failing to pay the amounts due thereunder.

114.    As a direct and proximate result of the breaches of the Promissory Note by HTI and Raviv, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $250,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note.

## COUNT FOUR
### (Breach of Promissory Note Dated December 9, 2021)

115.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if full set forth herein.

116.    Pursuant to a Promissory Note dated December 9, 2021, HTI promised to repay Plaintiff $40,000 "with cumulative interest of $600 and a professional service fee of $600 on or before January 31, 2022."

117.    The Promissory Note also provides that "In the event of default, [HTI] will also be responsible for any costs of collection on this Note, including court costs and attorneys' fees."

118.    The Promissory Note also provides that "any payment that is not honored when presented due to insufficient funds, there shall be a fee of $500 for the first rejection, and an extra $750 (on top of the original $500 fee) for each and every rejection thereafter."

119.    At the bottom of this Promissory Note, Raviv personally guaranteed the Promissory Note.

120.    The Promissory Note, including Raviv's personal guarantee therein, is a valid and binding contract.

121.    Plaintiff satisfied all of his obligations under the Promissory Note.

122.    HTI and Raviv breached the Promissory Note by failing to pay the amounts due thereunder.

123.    As a direct and proximate result of the breaches of the Promissory Note by HTI and Raviv, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $40,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note.

## COUNT FIVE

### (Breach of Promissory Note Dated November 3, 2022)

124.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if full set forth herein.

125.    Pursuant to a Promissory Note dated November 3, 2022, HTI promised to pay $50,000 to Plaintiff "with a cumulative professional service fee of $3,500" by December 31, 2022.

126.    The Promissory Note also provides that "In the event of default, [HTI] will also be responsible for any costs of collection on this Note, including court costs and attorneys' fees."

127.    The Promissory Note also provides that "any payment that is not honored when presented due to insufficient funds, there shall be a fee of $500 for the first rejection, and an extra $750 (on top of the original $500 fee) for each and every rejection thereafter."

128.    At the bottom of this Promissory Note, Raviv personally guaranteed the Promissory Note.

129.    The Promissory Note, including Raviv's personal guarantee therein, is a valid and binding contract.

130.    Plaintiff satisfied all of his obligations under the Promissory Note.

131.    HTI and Raviv breached the Promissory Note by failing to pay the amounts due thereunder.

132.    As a direct and proximate result of the breaches of the Promissory Note by HTI and Raviv, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $50,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note.

**WHEREFORE**, plaintiff Gary Nudelman respectfully requests judgment as follows:

(a)    For Count One, compensatory and punitive damages against Defendants in an amount to be proven at trial, but in no event less than $1.5 million, plus

Plaintiff's reasonable attorneys' fees and other costs incurred in bringing this action and pre-judgment interest at the statutory rate;

(b)    For Count Two, damages in an amount to be proven at trial, but in no event less than $1.5 million, plus Plaintiff's reasonable attorneys' fees and other costs incurred in bringing this action and pre-judgment interest at the statutory rate;

(c)    For Count Three, damages in an amount to be proven at trial, but in no event less than $250,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note;

(d)    For Count Four, damages in an amount to be proven at trial, but in no event less than $40,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note;

(e)    For Count Five, damages in an amount to be proven at trial, but in no event less than $50,000 plus interest, fees, and Plaintiff's attorneys' fees and costs incurred in enforcing the Promissory Note;

(f)    Awarding Plaintiff pre-judgment interest at the statutory rate;

(g)    Awarding Plaintiff his reasonable attorney's fees and other costs incurred in bringing this action; and

(h)    Awarding Plaintiff such other and further relief as this Court deems just and proper.


Dated: Uniondale, New York
        February 18, 2026

                    WESTERMAN BALL EDERER
                    MILLER ZUCKER & SHARFSTEIN, LLP


                    By: /s/ *Michael Kwon*
                            Michael Kwon, Esq.
                    1201 RXR Plaza
                    Uniondale, New York 11556
                    (516) 622-9200
                    *Attorneys for Plaintiff Gary Nudelman*